Good afternoon, your honors. May it please the court. My name is Michael Wein. I represent the appellant. Can you speak up just a little bit? Yes, your honor. I represent the appellant, William Graham. Though it certainly is understandable if this court has questions or concerns on the nuances of issues one and two, I'd like to concentrate the majority of my argument on questions three and four. This case involves the admission under the co-conspirator exception to use adversarial wiretap conversations between co-conspirators threatening to commit violence to quote unquote scare the life out of my client on a past alleged drug debt on a different drug than is charged in the conspiracy and was mostly triple heresy. Respectfully, these circumstances do not justify application of the co-conspirator exception. As argued in the brief, these conversations which were used in the government's opening statement throughout the three cooperating witnesses and in closing statements had a large effect on the jury. They permitted what is not normally construed to be an agency theory, which is the co-conspirator exception and still is, and there are no cases that have permitted an expansion of conspiracy law and evidentiary necessity under the co-conspirator exception to be used to criminally convict a defendant. This court really doesn't have to go much beyond the Urbana case, which has been cited at length in the appellant's brief. Is that the weightlifting case? Yes, Your Honor. But in addition, a lot of these issues that have been brought forth in this case were dealt with in the Krulwich case, which is a 1949 Supreme Court case. All the Supreme Court justices agreed that it was error to expand as, quote unquote, in furtherance of a conspiracy to include, in that case, post-attempts, post-conspiracy attempts to conceal the crime. And I say to Justice Jackson's concurrence, not only just because Justice Jackson has had a flair for writing, but a lot of the evils that were sought to go and be prohibited by Justice Jackson, who, if Your Honors recall, he was FDR's Attorney General. The first wiretapping bill that was actually submitted to Congress, Justice Jackson helped try to get passed. So the issues where my client is going and, after the fact, having conversations that he partakes, has nothing to do with, that goes and is intended to go and threaten him with violence, that respectfully should not be used by the government in conspiracy cases. And you could go one or two steps further. Think about it. Here they're going and threatening him with violence, his life. That was the quote, the attempt by Mr. Reeves that it was the co-conspirators' intention to scare the life out of him. Well, you could go even further with that. The co-conspirators could be discussing a kidnapping. And the government could argue that, well, this is all being done in furtherance of the conspiracy. You could have ransom, family members of other people being discussed by co-conspirators and saying, well, it's a past drug death, that's the reason they're talking about ransom, let's let that in. You could have attempted murder. That similarly has that same sort of no limit to the usage of these evidentiary as evidence. So respectfully, although it is our contention that the Urbana case, at least as far as the furtherance prong, is sufficient, it's noteworthy that this does not change conspiracy law or reduce the government's ability to prosecute conspiracy. There's been 60, 70 years where the government has quite a lot of arrows and quivers for those arrows to go and prosecute conspiracies. And there's not a single circuit case where it's been used on past drug deaths. Mr. Hanlon showed or cited to a couple of recent cases, but as argued in Appellant's brief, those were not on point. And they were a small part of the case. And certainly there hasn't been a case where threats of violence to this level, where the appellant did not, as a result of any threats, start going back to the conspiracy or assisting the conspiracy. This was purely an issue where people were talking to each other. And let me also say this. There's also the idle chatter issue that was discussed in Urbana, where it seemed that it was not part of the conspiracy itself. That, respectfully, also applies in this case. I assume your honors have had perhaps the opportunity to listen to the tapes themselves that were found by Judge Quarles to be admitted as evidence. All the co-conspirators, they're laughing. It's all being done on a single day out of five conversations out of 35,000 wiretapped conversations. And Mr. Graham was not on a single one of these 35,000 conversations. And that's a bit unusual. Usually there's some admission by someone who's being charged with conspiracy. And in this case, the facts, as they bore out, there was a gap proof that the government did not have Mr. Graham on a single conversation. The only thing they had were that one day where some of the co-conspirators were talking, and after the fact they say, well, yeah, it was Mr. Graham. That being said, when you have this gap proof, and I'm just citing this as a hypothetical, let's say instead of the 97 percent conviction rate, this gap proof would have adversely affected the possibility of a jury conviction down to 60 or 70 percent. Well, the government chooses to go and fill that. But you respectfully cannot fill that the way the government actually did it in this case, which is to say it is admissible evidence on the merits, excuse me, for the truth, saying it was a not hearsay. It was to be construed as a conversation on the co-conspirator exception, that in essence the people who were conspiring for a past drug debt were acting as his agents, and therefore everything that applies typically on conspiracy prosecutions applied in this case. As to, and I will, there's a case, and I did give Mr. Hamlin a copy of this case before argument, which was not cited to in the Pellin's brief, but at least procedurally, though it's a different circuit, it is a procedurally similar matter, so with this court's permission, I'll like to cite it. It's U.S. versus Cornett, 195, F3D, 776, 5th Circuit, 1999. So when the government had chosen to go in, use this case for, on the merits, it adversely affected the trial, and the conviction should be reversed. I'd like to get to questions presented number one and two, if I may. Obviously these issues have been litigated as to the missing portions or the non-transcribed portions of the wiretaps. There's at least cases from different circuits in favor to say this violated the Court Reporters Act. There are cases from the First and the Ninth Circuits that are cited in the Pellin's brief. And respectfully, at the very least, it would be appreciated where this court clarifies, was this a violation of the Court Reporting Act, so that in the future, what happened in this case was a bit unusual. Most cases where there's an allegation of a violation of the Court Reporter Act and something not being recorded, it seems as if after the fact they learned something's not recorded and they say it's a violation and we don't know what or why it was actually argued as to an appeal error. This case is a bit unusual. There's a fair amount of, in the record of this case, including the Fourth Circuit, that an error was discovered that was objected to on the actual admission of the tapes, or in this case, the audio recordings on CD. Let me ask you this. Was this situation unusual in that the tapes that were played for the jury were given back to the government as opposed to the court reporter keeping them? Is that the usual practice where you're from? My understanding is that's not unusual, Your Honor. It's a good point. I mean, in this case, it was treated as perhaps an exhibit, and Mr. Hamlin has, on behalf of the government, accepted responsibility that when it was returned, it vanished, has not been located, and that required additional work for the parties and Judge Quarles. The normal practice is to just give it back to the side that presented the exhibit. Yes, Your Honor. But that still poses a couple of questions. With most of the cases that came out, and again, there's at least two circuits to say the court reporter has to transcribe this, those involved tapes, which are not digitally recorded. They were just tapes, and they're easier to kind of come back. Here, there were two additional problems, at least. One was the CD itself was lost, and that doesn't usually happen. But additionally, you could have a CD that has hundreds of conversations and that are not, that are quote, unquote, omitted for evidence, but only the few that are actually played in court are the ones that are important for this court to later review. So there's more of a risk not having an appellate decision to say, hey, was what happened correct? Was there a harmless error? Again, there would have been an easier harmless error if it was somehow an analog tape, and probably the parties could have agreed to say, well, this is the evidentiary sticker. This was what was played. Let's go and reconstitute the record ourselves. Here, there was no capability, certainly not easily, to go and do anything like that. Can I ask you this question? Yes, Your Honor. By the way, from me, you absolutely get the creativity award of the month. Thank you, Your Honor. I'm raising this Court Reporter Act. But for a sound recording, would it be sufficient under the Act if the exhibit, the tape or the disc, is maintained in the custody of the clerk? Not completely, Your Honor. Why not? Because number one, most of the recordings are digitally recorded, so you'd have to specify what exactly was played. The U.S. Attorney? Wait.  We know what's played at trial. One, because I'm sure there are exceptions, but invariably the U.S. Attorney will prepare a book of transcripts, as it did here. Nobody expects a juror to sit there and actually listen to a wiretap conversation and be able to follow it along without a transcript. Right? Yes, Your Honor. Okay. And second, when the tape is played in the courtroom, it's an exhibit. And through, as Judge Traxler suggested or questioned, the general practice in many districts in this circuit is that the exhibits go back for safekeeping to the party. And that's typically in a criminal case, the U.S. Attorney's Office. And so there is a recording of the sound played in the courtroom in the form of the very exhibit which is used to play the recording. So I'm not sure why that wouldn't satisfy the act, putting everything else aside. In this case, Your Honor, two things. One is even the transcripts that the government later argued, those were not located for eight or nine months after that issue was brought to their attention. Okay. And part of the reason for that, I'm sorry to interrupt, I understand you didn't try the case, you're appointed, and we appreciate your service. But the defense lawyer had a copy of the transcripts, and in fact the defense lawyer had a copy of the audio disc, right? I don't know, Your Honor. Well, you don't know because you didn't ask for them. I wouldn't say that, Your Honor. Actually, I did ask for it, and they indicated it was in storage, and they had no idea. Fortunately, the timing table was Mr. Hanlon found it before. There was much more. If I may just finish up the thoughts, I see my time is over. There is, in addition to what's already argued, we would ask that all reasonable inferences in terms of any missing record be given in benefit of the defendant. There is a case out of the Seventh Circuit that suggests that may be also appropriate.  Mr. Hanlon? Your Honors, may it please the Court, my name is Michael Hanlon, Assistant U.S. Attorney, appearing on behalf of the United States today. The government does ask that the Court affirm the conviction and sentence in this case for the reasons discussed in the government's brief and for any other reasons I'll discuss today. I'm happy to begin wherever the Court wishes. I thought I would begin with the Court Reporter Rule 10 issues only because that's where we just left off with Mr. Wine. It is clear that the Court Reporter Act, if violated here, may be corrected with a Rule 10 hearing. The governing issue in a Rule 10 hearing is what happened in the District Court. That was the fundamental issue. What got played for the jury? What were the wiretaps? The government presented evidence at a hearing before Judge Quarles that overwhelmingly answered that question. The wiretap calls played were those that were on the CD that has now been marked and stamped and is in the government's custody as Exhibit 1, and the portions of those wiretaps were the portions that were transcribed in the government's exhibit book, which was Exhibit 2, and which was marked as an identification exhibit for this hearing just as a guidance on that apportionment issue. Your Honor, in response to your question, it is fairly routine practice in the District of Maryland for the U.S. Attorney to accept the exhibits that are presented at trial and to maintain them as part of the record, the exception, of course, being contraband like narcotics or firearms. They go back to the police. So I believe that relatively routine procedures were followed here by the court. The United States Attorney should have maintained those discs. I've accepted responsibility for that. But respectfully, I think that the issue has been fixed overwhelmingly. We know what was played in this case. What would you do where there's a dispute as to what portion of a CD got played? In other words, let's suppose the government, everybody agrees, only a portion of it got played and it was stopped before some prejudicial information was played. And then there's a dispute later on as to whether or not it was played or not played, the prejudicial part. How does that get resolved? How would you propose to resolve it with this system? I remember struggling and worrying about that issue in this case until I actually looked at the record and realized I thought we had an easier case than that. If I were faced with that problem, Your Honor, I think I'd probably do what I did here. I think I'd bring back the prosecutors. I think I would bring back the case agents. And I would put them on the stand. I would have them testify specifically about what they played and why. And if there were inadmissible and prejudicial information on that disc, then I'd probably elicit from the prosecutor, did you play this part and why not? And, of course, my hope would be I didn't play that part because it was prejudicial and inadmissible. I suppose in an extreme example we could theoretically... I'm sorry, Mr. Haley. I'm sorry. I thought Judge Traxler was asking what would you do in the first instance. How would you, if you were trying a case next week and you had, I don't know, 27 recordings on one disc and the court had given you a ruling on an in limine motion, would you not go and create a new disc of only the stuff that's going to be played? Thank you, Your Honor, and I'm sorry, Your Honor, if I missed something. Maybe that's not what Judge Traxler was asking, but that's a pretty good question. That's a fine question. I would do one of two things. The best and safest practice would probably be to simply make a new disc. I take it back. I have my I.T. guy who's a lot smarter than I am. Let me interrupt you right there. It seems to me the best and safest practice would be to have a court reporter record it. Yes, it would be that as well. And I've actually talked to my criminal chief about this, Your Honors, and we are talking to our courthouse court reporters about letting the tape run when the government is playing audio. This is an interesting case, and I actually think there are some learning processes here. We're going to have that conversation, and that would be very safe. Alternatively, I burn a new disc that cuts out the offending portions, and finally, if I can't do that, I note for the record the time index. Your Honor, for the record, the government is playing beginning at 1 minute and 37 seconds, and I'm ending at 2 minutes and 45 seconds. Those three options in descending order of goodness, I think, are probably the way to solve this problem, and that's what I'm certainly going to do in my future cases, and I think it's what we typically do. This is an unusual set of circumstances. Are most of the reporters in Maryland now using real-time, or is there still some carryover cinegraphic records? I think, and I can't speak definitively, but I feel like these days it seems to be predominantly real-time because I find when I'm going up to the bench on something, the judge has a transcript. A lot of times I've withdrawn objections because I realized that the question was actually not objection-worthy, and I'll go back, so I think we're increasing real-time. And how would the court reporter using a real-time system actually record a wiretap conversation? Would it be expected that he or she would transcribe as she listens or he listens, or are we talking about recording on the real-time system the audio of what's being played in the courtroom, or both, I guess? I have to think the latter, Your Honor, because I don't believe that it would be a practical possibility for our court reporters to transcribe wiretaps. It's all your agents can do to transcribe it, after listening to it for 19 times. They are challenging. I don't think a court reporter could possibly be expected to do that. I think it would generate confusion. I think letting the audio run is a natural solution here. So letting it run while the court reporter's system is picking up the audio in the courtroom? That would be my suggestion if I were in charge, yes. That's, I think, probably what I... I think it would have solved the problem here, and I think it will probably solve the problem going forward. It's a decision that will be made over my pay grade, but yes, that occurs to me as a reasonable solution. But then what happens, if anything, when the court reporter is asked by a defense counsel like Mr. Wayne to transcribe the audio of a wiretap conversation? And there are a million uh-huhs, and uh-huh, and I don't know, and you know, Hoagie said this, and Gussie may have said something. I don't know how a poor court reporter could possibly pull it off. I can't speak for the court reporters, but there was actually correspondence that's in the joint appendix, and I don't have the citation on it, as I apologize, but our court reporter made clear, I'm not going to... I couldn't have done that, wouldn't have done that. In that situation, perhaps Mr. Wayne gets his audio, gets the court's permission to give it to a third-party court reporter or something like that. These are the solutions. The government does submit that we solved this problem by a mile in this case, this unusual set of circumstances. The second issue, of course, is the more substantive admissibility issue. Should these wiretaps have come in anyway, the government does submit that these wiretap calls did satisfy the co-conspirator exception to the hearsay rule. They satisfied both provisions of Rule 801D2E. Number one, were these conversations, were these wiretap calls statements by a member of a conspiracy with Mr. Graham during the conspiracy? The answer is, and admittedly this is a somewhat unusual posture than a lot of our cases, the answer is yes. This conspiracy still existed. It was still going on. It never terminated. These individuals, Mr. Reeves, Mr. Marshall, Mr. Gallardo, were all still members of a conspiracy to distribute narcotics. They were anxious to deal drugs. They wanted to deal drugs. There is not a shred of evidence in this case, and there has been no suggestion or attempt by the defense to satisfy their burden that the defendant ever withdrew from this conspiracy. There's not even an argument in any brief about Mr. Graham withdrawing, and I don't think the defense could make such a showing. They were still in a conspiracy together under the law, and Mr. Graham, as were the declarants, were all members of it. I don't think the government needs this given the burdens, but when you consider the testimony of Mr. Marshall, which appears at Joint Appendix page 385, this is an even easier case. Mr. Graham's response when asked about whether or not he was going to pay his debt was he'll pay his money when he gets more product. Mr. Graham wanted more cocaine. He was ready, willing, and able to continue in this business. He wanted to continue in this business, and the conspiracy lived, even if the government had the burden, which I don't in this posture. It's satisfied here. This conspiracy was alive and well. The second prong of 801D2E, Your Honors, is did the conversations further the conspiracy? The government again submits that it did. The issue is not whether or not Mr. Graham's personal financial interests were furthered, and the law does not require that the conversations be non-adverse to him. These were debt collection calls made in furtherance of the conspiracy of the organization, if you will, and therefore they satisfied the rules of evidence. The defense has correctly pointed out that I cite no cases that are 100% on point in the sense of being mirror images to this case, but the government's cases are in the ballpark, and the defense, respectfully, has cited no cases in which there was collection of debt being undertaken like this, and they were found to be inadmissible. This is a good, solid example of statements furthering a conspiracy. Briefly, the defense's case citations, although all important for the principle of conspiracy, do not get the defense where they need to be. Urbanics, an important case, but its facts are completely different from this case. There was no furtherance. Cornett, the more recently decided case, again, absolutely no furtherance. Perez, which I think is a Seventh Circuit case, also no furtherance, not even a hint of it. Krulowicz, and I'll end here unless the court has questions for me, is the case that was more prominently featured in the defense reply brief, and Mr. Wine discussed the case today. Krulowicz is an interesting case, and the government doesn't dispute the concerns about an implied infinite conspiracy. That is a potential problem, but that's not the fact pattern we have here. It is not the government's theory, and never was, that this was a conspiracy that persisted simply because there was a generalized sense of concealment. This conspiracy was alive and well with the goal of distributing narcotics, and Mr. Graham was ready, willing, and able to participate as soon as he got more product. This conspiracy still existed. The statements furthered the conspiracy, and they were admissible. The government also argues on brief that an argument could be made that any error would have been harmless in this case, but given the overwhelmingly admissible nature of the statements, I'll end on this subject unless the court has any further questions. I do have substantial time remaining. I think we understand your points. Thank you. Mr. Wine, reply. Thank you, Your Honor. I'd like to go and briefly reply on a few matters that were discussed by Mr. Hanlon. Keep in mind there was no conditional admission done in this case. It was admitted at the outset by the court, and I would like to go and note that although there's no circuit court cases, the government argues that that is beneficial to their side. Respectfully, we would argue that's because there hasn't been a usage of conspiracy law on this level regarding past drug debts for adversarial purposes, and this was discussed somewhat presciently by Justice Jackson in the Krulwich case. There is a case I would like to cite, given that the government said there was no cases. It's not a circuit case. It is a federal district case. It's by Chief Judge Norton from South Carolina. It is U.S. v. Kang, K-A-N-G-7-1-5-F-S-U-P-2-D-6-57, 6-82-2010. And actually that case, both there were arguments about it being done for concealment purposes and for personal monetary gain, and Judge Norton said, citing Krulwich at length, that that was improper and to use that on the basis of conspiracy. Sometimes there are cases where you get a case and say and you have to deal with what was objected to at trial, but also understand that there is a difference between what is sufficient evidence and what is an evidentiary argument. The evidentiary argument was clearly objected to on both the that this was within the scope of the conspiracy and on the furtherance prong. You could have two people who are agreeing, who are co-conspirators, could have a lengthy criminal record and plea agreements, and that would be sufficient evidence of conspiracy. However, that is respectfully different and has been argued by the appellant is different from a situation where the co-conspirator exception has been used. And if it was improper that these five audio tapes were used against Mr. Graham, that were used and argued throughout his trial to provide some alleged link-up, then under Urbanik, under Krulwich, he respectfully should go and get a reversal. As I said, there's a difference between going and allowing this evidentiary-type position, which Justice Jackson went into detail could, and Judge Norton actually said, citing Krulwich, that to go and countenance the government's position for not just an objective to conceal the conspiracy, but also to obtain personal enrichment would eviscerate the boundaries of conspiracy law. Mr. Graham, they could have argued under the facts of this case if they wanted to, and it would be interesting to see whether or not the judge would have let it in. They could have tried to argue something to the effect of, well, let's go and use this to rehabilitate. But none of that ever happened. And this court already has the Bullock case to go and say you cannot go and impeach before any sort of attempt was made. You cannot claim it was impeachment when the defendant never had an opportunity to impeach, which is this case. Say that again. You cannot claim it was impeachment before the defense counsel has an opportunity to impeach. In this case, it was admitted as substantive evidence from the outset. It was argued by the government in their opening. And again, Judge Quarles actually left open the question of whether or not it could be done as a conditional. And the government said, we want to argue it in our opening. We want to have it in our first main witness. And based on that, Judge Quarles let this in. But it would be an interesting issue. Would any of this have gotten in? And if it would have gotten in, again, these are triple hearsay, for the most part conversations. It's possible defense counsel would simply make a choice tactically to not cross-examine at all on this issue, to avoid any sort of pre-motive arguments of opening the door. But that didn't happen. The Blevins case, which is cited, too, by the government, it actually was in a similar procedural posture to our argument, except for they affirmed that it was proper to admit those co-conspirator exceptions. But the alternative argument was, well, it would have gotten in. And in Blevins at 125, that's why in Blevins the decision was affirmed and not reversed. Mr. Wine, I believe you're out of time. Yes, thank you, Your Honor. In conclusion, we'd like to request on behalf of Mr. Graham that this court reverse the judgment and enter a new trial. Thank you.
judges: William B. Traxler, Jr., G. Steven Agee, Andre M. Davis